## IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 60027-7-II |
| Respondent, | |
| v. | UNPUBLISHED OPINION |
| TIFFANY NOEL GULLIKSEN | |
| Appellant. | |

PRICE, A.C.J. — For the first seven months of 2022, Tiffany N. Gulliksen was employed as a restaurant supervisor for Vancouver Mall Retirement Center ("Van Mall"). As part of her duties, Gulliksen would often make work-related purchases to either stock the facility's restaurant or host activities and events for the residents. When Gulliksen would make these purchases, she would either borrow a Van Mall-issued credit card or, if one was not available, she would use her own money and seek reimbursement.

In July 2022, Van Mall's business office manager noticed suspicious charges on two of the facility's credit cards and reported it to law enforcement. Following an investigation, the State charged Gulliksen with one count of second degree identity theft. Although Gulliksen denied using the cards for improper purposes, a jury found her guilty of the charge.

Gulliksen appeals her conviction, arguing that the trial court violated her Sixth Amendment right to confrontation when it admitted two specific exhibits, a receipt and a photo from one of the

stores. She also contends that the State presented insufficient evidence to support her conviction. We affirm.

FACTS

I. BACKGROUND

In 2022, when Gulliksen was the restaurant supervisor for Van Mall, she was responsible for supervising servers, stocking the restaurant, and helping clean and serve if needed. Sometimes Gulliksen would also be part of hosting events for Van Mall including date nights and parties.

At times, these responsibilities required Gulliksen to purchase items. She could either purchase the items for Van Mall with her own money and later get reimbursed, or she could use one of the credit cards that were issued to other Van Mall employees. Van Mall's policy was that employees could borrow the credit cards to make work-related purchases so long as a receipt was provided for the purchases. One of the cards Gulliksen used was issued to Crystal Hennessy, the business office manager, and one of the cards was issued to Daniel Proudfoot, the receptionist.

In July 2022, these two Van Mall credit cards were linked to suspicious purchases. Hennessy received a notice from the credit card company that her Van Mall credit card had been maxed out. When Hennessy looked at a list of the credit card's recent history, she noticed two suspicious transactions that she did not recognize. Similarly, two suspicious purchases were made on Daniel Proudfoot's Van Mall credit card.

Gulliksen had been the last person in possession of both Hennessy's and Proudfoot's credit cards when these transactions occurred.

Hennssey reported the suspicious activity to law enforcement. As part of the investigation, law enforcement examined the list of questionable charges and contacted three different retail

stores—Ross, Burlington, and TJ Maxx—to obtain additional records associated with these transactions. Each of the stores provided records related to the transactions, including receipts and surveillance footage of Gulliksen at the cash register.

Following the investigation, the State charged Gulliksen with one count of second degree identity theft. The case proceeded to a jury trial in April 2024; however, it was declared a mistrial due to a deadlocked jury. The retrial was scheduled for August 2024.

## II. Second Jury Trial

### A. Testimony of Crystal Hennessy

Van Mall business manager, Hennessy, explained that, in addition to being responsible for payroll and scheduling, she kept track of Van Mall's credit cards. Hennessy would keep track of the receipts related to the charges on the credit cards and match the receipts to charges. This way, Hennessy could organize the monthly spending by each department.

Hennessy explained that because there was only a limited number of credit cards, some employees would either purchase items with their own money and request reimbursement or they would borrow one of the credit cards. If an employee were to use one of the Van Mall-issued credit cards, they would need to have access to the card's PIN. After the purchase, the employee would return the card to its original assigned user, along with a receipt.

Hennessy also explained Gulliksen's duties as the restaurant supervisor. Hennessy testified that in addition to managing the day-to-day operation of the facility's restaurant, Gulliksen would often purchase items for parties or events. For example, in July 2022, when Van Mall hosted a Fourth of July event for its residents, Gulliksen, with her own money, purchased themed

3

decorations and other event-related items at Dollar Tree, Total Wine, and Party City. Gulliksen was later reimbursed for these purchases.

Hennessy explained that although it was common for Gulliksen to make purchases for the restaurant or for special events, it would have been "very unusual" for her to make a purchase for a specific resident. 1 Verbatim Rep. of Proc. (VRP) at 498. Some Van Mall's employees acted as personal shoppers for the residents, but Gulliksen did not have those responsibilities.

About a week after the Fourth of July event, Henessy received a call from the bank that her Van Mall-issued credit card had exceeded its credit limit. The card's recent activity showed two unexpected purchases, one from Ross for $367.37 on July 5, and one from Burlington for $533.51 on July 7. At the time of this call, Hennessy did not know where her card was. Hennessy had given the card to Gulliksen so that Gulliksen could treat the food service staff to lunch, but Gulliksen never returned the card afterward.

Hennessy explained that she then investigated the recent transactions on the other Van Mall-issued credit cards and tried to match the transactions to the receipts they had on file. Hennessy testified that all of the purchases matched up with receipts, except for two purchases on Proudfoot's credit card—one purchase from Ross for $102.99 on July 2 and another purchase from TJ Maxx for $150 on July 3.

B. TESTIMONY OF DANIEL PROUDFOOT

Daniel Proudfoot testified that he was the receptionist at Van Mall. He explained that he had received a Van Mall credit card as part of his role, and he used it for the residents' personal shopping expenses or for hosted events.

4

As for the personal shopping expenses, Proudfoot said that when a resident needed something, "they would just leave a handwritten note on [his] desk" and he or one of the drivers would pick up the requested items and return with a receipt. 2 VRP at 523. Proudfoot would give the receipt to Hennessy, who would, in turn, bill the resident. Usually this personal shopping was for "basic groceries," toiletries, or medications for the residents. 2 VRP at 522.

Proudfoot testified that in July 2022, he had allowed Gulliksen to borrow his credit card to purchase decorations and party supplies for the Fourth of July event. Proudfoot said that although Gulliksen had later returned his card to him, she never gave him receipts for her purchases.

Later in his testimony, the State showed Proudfoot a copy of his credit card statement from July 2022. When reviewing the document, Proudfoot identified three purchases that he had not made—one purchase from Ross for $102 and two other purchases from TJ Maxx for $1.62 and $150.

Like Hennessy, Proudfoot testified that it would have been "unusual" for a resident to ask Gulliksen to do their personal shopping for them. 2 VRP at 527. He explained that although Gulliksen had a good relationship with the residents, it was more of his role as receptionist, rather than hers as restaurant supervisor, to pick up items for residents. And Proudfoot said that when residents did ask him for personal items, they had never asked for purchases from clothing stores.

C. TESTIMONY OF OFFICER LARSON

Officer Cole Larson testified that as part of the law enforcement investigation, he contacted Gulliksen by telephone. When he called Gulliksen, he identified himself as law enforcement and explained that he was calling because of "[s]ome missing credit cards and then some suspicious activity involving purchases with those cards later on." 1 VRP at 470.

5

Gulliksen said that "she believed she left [the cards] in her desk . . . . " 1 VRP at 470. Gulliksen also told Larson that she thought that the suspicious transactions were possibly because "there was a series of items that were rang through the register, and they were supposed to be separated into personal purchases and business purchases, but that was not done." 1 VRP at 471. Gulliksen also theorized that "her ex-boyfriend at the time . . . had possibly taken the cards out of her purse." 1 VRP at 471.

D.  TESTIMONY OF OFFICER MCPOLAND

Officer Simone McPoland testified that as part of the investigation, she collected evidence from the various stores connected to the suspicious transactions—TJ Maxx, Ross, and Burlington. The State used her testimony to offer into evidence receipts and surveillance photos from her investigation, including one from the suspicious purchases made at Burlington.

1.  Exhibit 5—Burlington Receipt

McPoland first explained that Van Mall provided law enforcement the specific dates of the transactions, the last four numbers of the cards, and a list that included the amounts charged and the store locations. When McPoland provided this information to Burlington, the store provided a surveillance photo and a receipt from July 7.

The State had McPoland confirm that the amount listed on the receipt, $533.51, matched the amount for the July 7 charge on the list provided by Van Mall. The receipt included over 40 items, including what appeared to be children's toys, clothing, and shoes; listed were, "3 Roblox Game Packs: Asst," "Belted Cargo Short," "25Scuba Back Zip Pncl:B," "Panto Embl Flat w Ankl

Strap," and "Hazel-03L Embelished Slingbac." Ex. 5.[1] The State offered the receipt into evidence without any objection from defense counsel. The trial court admitted the receipt into evidence as exhibit 5.

On cross-examination, defense counsel asked McPoland questions that appeared to challenge the credibility of the Burlington receipt and whether it actually represented the purchases from the transaction on Van Mall's list. The defense also pointed out that the Burlington receipt had a date stamp of July 14, an entire week after the date listed on the credit card statement provided by Van Mall (July 7). Defense counsel asked McPoland whether she understood why the exhibit was dated July 14. McPoland responded that she did not know because it was "[Burlington's] documentation." 1 VRP at 462.

2. Exhibit 10—Burlington Photo

The State also asked McPoland about a surveillance photo from Burlington that appeared to depict Gulliksen making a purchase. McPoland identified the photo as one that she had received from Burlington in response to her request "for any photos pertaining to . . . those transactions." 1 VRP at 449.

Defense counsel objected "as to [the] foundation of the photograph[]." 1 VRP at 450. They argued that the photos "need[ed] to be correlated to the time of the transaction[s]." 1 VRP at 450. The trial court overruled defense counsel's objection because the State had not yet offered the photo at this point.

---

[1] The Ross receipts also showed similar purchases. One of the Ross receipts showed what appear to be boy's clothing, ("Puma Boy's 3pk Spo"), a seersucker top ( "Purple/Wt Seersuck"), boxer briefs ("Tilt Shift Boxer B"), a mug ("Cold-1 Mug 40oz OG"), and sports apparel or paraphernalia ("X Blazers Lillard"). Ex. 9.

The State continued to ask McPoland questions about how she knew that the Burlington photo was the same one she received during the investigation. McPoland explained that she gave Burlington "the date of the transaction, the amount[,] and the last four numbers of the card used." 1 VRP at 450. And, in return, she received the photograph. At that point, the State offered the Burlington photo into evidence. The defense objected again based on a lack of foundation. The trial court promptly excused the jury so that the parties could make their arguments and ask McPoland additional questions.

Defense counsel proceeded to ask McPoland whether McPoland knew the photo was actually taken during the completion of suspicious transactions alleged by Van Mall.

> [Defense Counsel]: Can you say why you can say this [photo] is on a particular date at a particular time?
>
> [McPoland]: Not on that photo, no.

1 VRP at 451. Defense counsel reasserted their objection based on "foundation," explaining that McPoland did not know when the photo was taken or how it correlated with the suspicious transactions. 1 VRP at 453.

The State responded that defense counsel's arguments went to the photograph's weight, not its admissibility. The State contended that "there ha[d] been foundation laid that there were specific transactions that were contested at Burlington in that specific amount, and that's the information [McPoland] gave . . . ." 1 VRP at 453. The State also reiterated that the photograph was received in direct response to McPoland's request, which provided the date and time of the suspicious transaction.

The trial court agreed with the State, and the photograph was admitted as exhibit 10.

Similar to his cross-examination about the receipt, defense counsel's questions highlighted that the photo was not date stamped, and therefore McPoland could not be certain that the photo was taken the same date as the suspicious transaction alleged by Van Mall. McPoland admitted that she could not tell when the photo was taken based on the photo itself, but she repeated that the photo was received in response to her specific request about the July 7 Burlington transaction.

Defense counsel also asked McPoland whether the photo could have been related to a personal shopping trip Gulliksen did at Burlington. To which McPoland repeated that she just knew that the photo in exhibit 10 was the one she received after telling Burlington that she wanted photos related to the July 7 transaction.

> [Defense Counsel:] Okay. And it—does it take into account that Ms. Gulliksen may shop at the stores independently of her retirement center duties?
>
> [McPoland:] They pull it by the date and time that I gave them, and the amount.
>
> [Defense Counsel:] But they could have—she could have been there on her own business and her own time, and this photograph could have been taken?
>
> [McPoland:] They—I just give them information and that's what they found.

VRP at 461.

On redirect, McPoland again explained that she received the receipt and photo from Burlington after giving them the specific date, time, and credit card information that had been provided to her by Van Mall.

At no time did defense counsel raise the right to confrontation related to either exhibit.

E.  TESTIMONY OF TIFFANY GULLIKSEN

Gulliksen testified in her defense.  She explained that while she was employed at Van Mall, there was no activity director, so in addition to her restaurant duties, she took on the additional role of planning events for the residents such as date nights, happy hours, and movie nights.

Gulliksen said that from her many interactions with the residents, she would sometimes purchase things for them, usually at Ross or TJ Maxx.  She explained,

> For date night, they would send me, you know—a couple of the ladies would send me either to get a blouse or some—little minimal things, you know.  Sometimes we did birthdays, so I would get candles.  Or they had daily devotions.  They loved those.  There was just a variety of things.  I did—for parties, we did all the decorations or the supplies for happy hour.  We did wine and beer and cocktails every once in a while.

2 VRP at 560.  Gulliksen testified that when she made these types of purchases, she would usually use one of the Van Mall credit cards or, if none were available, would use her own money and seek reimbursement.  Gulliksen explained that the system for making purchases for residents "was not really organized."  2 VRP at 576.  She said,

> [I]t was never a written request.  They would ask me or [Hennessey], and [Hennessey] would call me either on my cellphone or ask me in transition of, you know, leaving, checking out with her, something like that.

2 VRP at 576.

After showing Gulliksen the July 2022 statement from Proudfoot's credit card, defense counsel asked if she remembered making either the Ross or TJ Maxx purchases.  Gulliksen said that she did not remember exactly, but that those purchases were likely for games and prizes for Van Mall's Fourth of July event.

10

Defense counsel also showed Gulliksen exhibit 5, a copy of the Burlington receipt that was stamped with the date of July 14. Gulliksen denied making any purchases on July 14 because she had been on vacation.

Gulliksen testified that she was surprised when she was contacted by Officer Larson. She said that she had never been told by any of her superiors that there were problems with how she had used the credit cards, and that she had always provided receipts for her purchases and returned the credit cards when she was done. Gulliksen also denied ever telling Larson that she had thought her ex-boyfriend had taken the Van Mall credit card from her and used it.

The jury convicted Gulliksen of second degree identity theft. Gulliksen appeals.

ANALYSIS

Gulliksen makes two assignments of error. First, she argues that the trial court violated her constitutional right to confrontation. Second, she argues that the State presented insufficient evidence for her conviction because it failed to prove that she "knowingly used the company credit cards for an improper purpose." Opening Br. at 32. We disagree.

I. CONFRONTATION CLAUSE

For the first time on appeal, Gulliksen argues that the trial court violated her Sixth Amendment right to confrontation when it admitted the Burlington receipt and photo (exhibits 5 and 10).[2] She contends that because no witnesses from Burlington could be questioned or testify

---

[2] Although Gulliksen raised the right to confrontation regarding the admission of this evidence during her first trial, she did not raise any confrontation claims prior to or during the August 2024 retrial.

about the authenticity of the documents or whether they pertained to the relevant dates, she was unable to contest the evidence presented against her.

The State responds that because Gulliksen "did not object to the admission of either exhibit 5 or exhibit 10 on confrontation clause grounds, there can be " 'no denial' of her 'right to confront witnesses.' " Br. of Resp't at 13 (quoting *State v. J.K.T.*, 11 Wn. App. 2d 544, 564-65, 455 P.3d 173 (2019), *review denied*, 195 Wn.2d 1017 (2020); *State v. Burns*, 193 Wn.2d 190, 211, 438 P.3d 1183 (2019). Citing to our Supreme Court's opinion in *State v. Burns*, the State contends that if a defendant fails to raise an objection on confrontation clause grounds at trial, then the objection is waived, and the defendant cannot argue this claim on appeal. We agree with the State.

The Sixth Amendment provides individuals with the right to confront adverse witnesses. U.S. CONST. amend. VI; *State v. Darden*, 145 Wn.2d 612, 619, 41 P.3d 1189 (2002). Confrontation means more than mere physical confrontation. *Darden*, 145 Wn.2d at 619. "The primary and most important component is the right to conduct a meaningful cross-examination of adverse witnesses." *Id.* at 620.

In *Burns*, our Supreme Court addressed whether a defendant who fails to raise a confrontation clause claim at trial waives the claim or whether they may use RAP 2.5(a)(3) to claim a manifest constitutional error. 193 Wn.2d 190, 206-07. There, the defendant was charged with assaulting a woman. *Id.* at 194. At trial, the victim was not expected to testify, but two witnesses testified about some of her statements about the assault. *Id.* at 198-99. Although defense counsel objected to some of the statements on hearsay grounds, counsel "did *not* object on confrontation clause grounds to [the victim]'s previous statements . . . even after learning she would not testify." *Id.* at 201.

The *Burns* court held that the defendant waived his confrontation claim because confrontation rights fell under a certain category of constitutional rights that "may be waived by a failure to object." *Id.* at 210-11. The *Burns* court explained that the United States Supreme Court has "emphasized the burden of the defense to object to evidence in violation of the confrontation clause." *Id.* at 208. Additionally, allowing a defendant to bring a confrontation claim for the first time on appeal would have numerous practical consequences for judicial efficiency and clarity for appellate review. *Id.*

> [I]t would place the trial judge in a compromising position. The judge would be faced with the decision to sua sponte identify and rule on a confrontation clause violation, which may disrupt trial or defense tactics, or risk presiding over a trial that could be reversed on appeal. Whether defense counsel will object on confrontation grounds can unquestionably be a trial tactic. When the defense has the choice to object or not, where no objection or motion to strike is made, appellate courts are left speculating as to whether it was a trial tactic or an error by the defense. Requiring an objection also has a practicable aspect: the trial court judge will rule on the objection, giving the appellate courts an actual trial court decision to review.

*Id.* at 209-10. With this reasoning, *Burns* concluded that without an objection at trial, there is no denial of confrontation rights, and thus, " 'there is no error by the trial court, manifest or otherwise that an appellate court can review.' " *Id.* at 211 (quoting *State v. Fraser*, 170 Wn. App. 13, 25-26, 282 P.3d 152 (2012).

Here, Gulliksen makes no argument that she preserved her confrontation claim as required by *Burns*. At trial, Gulliksen did not object to the admission of the Burlington receipt (exhibit 5), and she made only a "foundation" objection to the admission of the photo (exhibit 10). Because there was no objection regarding the right to confrontation specifically, Gulliksen's failure to object on this ground leaves us "speculating as to whether it was a trial tactic or an error." *Id.* at

209. Gulliksen not only deprived the trial court of the opportunity to make a ruling on the issue, but she also gave us no "actual trial court decision to review." *Id.* at 210. Thus, under *Burns*, Gulliksen waived any confrontation claim.

## II. SUFFICIENCY OF THE EVIDENCE

Gulliksen also argues that there is insufficient evidence to support her conviction for second degree identity theft. We disagree.

A sufficiency of the evidence claim admits the truth of the State's evidence and all reasonable inferences that can be drawn from that evidence. *State v. Stotts*, 26 Wn. App. 2d 154, 163, 527 P.3d 842 (2023). All such inferences " 'must be drawn in favor of the State and interpreted most strongly against the defendant.' " *Id.* (quoting *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992)). Direct and circumstantial evidence are equally reliable. *State v. Miller*, 179 Wn. App. 91, 105, 316 P.3d 1143 (2014). "We defer to the trier of fact on issues of conflicting testimony, credibility of witnesses, and the persuasiveness of the evidence." *State v. Arquette*, 178 Wn. App. 273, 282, 314 P.3d 426 (2013). After properly viewing the evidence in a light most favorable to the State, we determine whether any rational finder of fact could find that all the elements of the charged crime were proven beyond a reasonable doubt. *State v. Roberts*, 5 Wn.3d 222, 231, 572 P.3d 1191 (2025).

To convict Gulliksen of second degree identity theft, the State must have proved that she "knowingly obtained, possessed, transferred, or used the financial information of another person with the intent to commit any crime, knowing that financial information belonged to another person" and, as a result of these actions, obtained credit, money, goods, or services in an amount under $1,500. *Stotts*, 26 Wn. App. 2d at 163-64; RCW 9.35.020(1), (3). The State need not have

proved that Gulliksen intended to commit a specific crime; proof of intent to commit any crime is sufficient. *State v. Fedorov*, 181 Wn. App. 187, 197, 324 P.3d 784, *review denied*, 181 Wn.2d 1009 (2014).

Gulliksen argues that the State failed to prove that she "knowingly used [Van Mall's] credit cards for an improper purpose." Opening Br. at 32. She contends that the State's only evidence to convict her "was a picture purporting to [be her], receipts without context, and contested statements"—none of which showed that she had actually taken or used the cards. Opening Br. at 29. Gulliksen also points out that Hennessy and Proudfoot acknowledged that she was authorized to use their credit cards to make certain purchases and that "residents would sometimes ask employees to purchase things." Opening Br. at 32.

The State responds that there was "substantial evidence of Gulliksen's guilt." Br. of Resp't at 22. The State highlights that both Hennessy and Proudfoot testified that they had given Gulliksen their credit cards when the alleged unauthorized purchases were made, and that she never provided them with receipts. Additionally, Hennessy testified that Gulliksen was the only person that she had given her card to during this period. And, during the investigation,

> Burlington, in response to request for a copy of a receipt for the transaction utilizing Gulliksen's Van Mall credit card on July 7, 2022 for $533.51, provided a still photograph of the transaction that depicts Gulliksen and her son, and a receipt detailing purchases that appear personal in nature and unrelated to Gulliksen's job duties[.]

Br. of Resp't at 22. The State also points out that Gulliksen told Officer Larson a story that was inconsistent with her trial testimony. For example, she told the officer that any disputed transactions "were possibly the result of personal and business purchases" and that her ex-boyfriend may have been responsible. Br. of Resp't at 22-23. But at trial, she did not mention

these possibilities; rather, she implied that she may have made them for the residents or for a Van Mall event she was helping plan.

We agree with the State that sufficient evidence supports this conviction. It is true that Gulliksen was authorized to use either Hennessy or Proudfoot's credit cards for work-related purchases; however, circumstantial evidence supports the conclusion that the relevant purchases at Ross, TJ Maxx, and Burlington were not work related. *See Miller*, 179 Wn. App. at 105 (explaining the direct and circumstantial evidence are "equally reliable"). For example, the Burlington receipt included children's toys, clothing, shoes, and personal items (items included, "3 Roblox Game Packs: Asst," "Belted Cargo Short," "25Scuba Back Zip Pncl:B," "Panto Embl Flat w Ankl Strap," and "Hazel-03L Embelished Slingbac"). Ex. 5. But both Hennessy and Proudfoot testified that it would have been "unusual" for Gulliksen to make purchases at clothing stores or to make personal purchases for residents. 1 VRP at 498; 2 VRP at 527. According to Proudfoot, personal purchases for residents were typically for "basic groceries," not the types of items listed on the Burlington receipt. 2 VRP at 522.

Additionally, during the time period of the suspicious purchases, Gulliksen requested to be, and in fact was, reimbursed for purchases for the Fourth of July event at places like the Dollar Tree, Total Wine, and Party City. Clothing purchases at TJ Maxx, Burlington, and Ross would be inconsistent with the types of items associated with that type of event.

Gulliksen also provided different accounts of what could have transpired with these purchases. During the investigation, she told law enforcement that perhaps her ex-boyfriend misused the cards or perhaps that her personal purchases were mistakenly comingled at the register with facility purchases. But during her trial testimony, she implied that the purchases could have

16

been made for individual residents or for an event at Van Mall. Her conviction itself shows that the jury did not find her testimony credible, and we defer to the jury on issues of conflicting testimony and credibility of witnesses. *See Arquette*, 178 Wn. App. at 282.

After viewing this evidence in a light most favorable to the State, a rational finder of fact could find that all the elements of the charged crime were proven beyond a reasonable doubt. Thus, Gulliksen's conviction is supported by sufficient evidence.

CONCLUSION

We affirm.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

PRICE, A.C.J.

We concur:

GLASGOW, J.

CRUSER, J.

17